UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COPY

---------------------------x
TANYA BUTLER,                  :
        Plaintiff,            :    CIVIL ACTION NO.
                              :    3:02CV1896 (SRU)
        vs.                   :
                              :
JOHN E. POTTER,               :    January 22, 2004
Postmaster General,           :
U.S. Postal Service,          :
        Defendant.           :
---------------------------x


DEPOSITION OF TANYA BUTLER


    Taken before Lee Ann Biancucci, LSR #224, RPR,
a Court Reporter and Notary Public for the
State of Connecticut, pursuant to Notice and
the Federal Rules of Civil Procedure, at the
U.S. Post Office, 50 Brewery Street, New Haven,
Connecticut, on January 22, 2004, commencing at
11:45 a.m.

**US POSTAL SERVICE**
**LAW DEPARTMENT**

FEB - 3 2004

**WINDSOR FIELD OFFICE**
WINDSOR CT   06006-0170

Falzarano Court Reporters
117 N. Saddle Ridge
West Simsbury, CT    06092
860.651.0258

1    APPEARANCES:

2    For the Plaintiff:

3      UNITED STATES POSTAL SERVICE
       8 Griffin Road North
4      Windsor, CT   06006-0170
       860.285.7098
5      860.285-7397
            By:  ANTHONY T. RICE, ESQ.
6                Northeast Area Law Office

7    For the Defendant:

8      WILLIAMS & BARBER
       55 Church Street, Suite 800A
9      New Haven, CT   06510-3014
       203.787.2236
10     203.782.2843
            By:  JERALD S. BARBER, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Falzarano Court Reporters

S T I P U L A T I O N S

It is stipulated and agreed between counsel for the parties that all objections, except as to form, are reserved until the time of trial.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the notice are waived.

It is further stipulated that the reading and signing of the deposition transcript by the witness may be before any notary public.

1        (Deposition commenced: 11:45 a.m.)

2

3        TANYA BUTLER, Deponent, of

4        73 Rodney Street, West Haven,

5        Connecticut 06516, having been first

6        duly sworn by the Notary Public, was

7        examined, and testified, on her oath,

8        as follows:

9

10        DIRECT EXAMINATION

11

12   BY MR. RICE:

13   Q    Good morning, Ms. Butler.

14   A    Good morning.

15   Q    My name is Tony Rice.  I'm a Postal Service

16   attorney and a Special Assistant U.S. Attorney in

17   this particular case.

18        I'm going to ask you some questions today

19   about the claims you've made in the lawsuit, and

20   if my questions are not clear to you, please ask

21   me to rephrase them.

22        If during the course of the deposition you

23   need to take a break, feel free to take a break.

24   Just let me know.

25        Let me start by asking you:  In addition to

1      talking to Mr. Barber, and I'm not asking you

2      about those conversations, what if anything did

3      you do to prepare for today's deposition?

4          A    Nothing.

5          Q    Did you review any documents?

6          A    No.

7          Q    How is your memory generally today?  Is

8      there anything impairing -- do you take any

9      prescription medicine or anything that might

10     impair your memory?

11         A    No.  I don't think so.

12         Q    In my case, it's old age.

13              What's your current occupation, ma'am?

14         A    I'm a supervisor for the Postal Service.

15         Q    Where are you domiciled or stationed?

16         A    Norwalk, Connecticut.

17         Q    What level supervisor?

18         A    Seventeen.

19         Q    How long have you been in Norwalk?

20         A    Approximately four years.

21         Q    Are you a -- did you say customer service

22     supervisor or delivery supervisor?

23         A    Customer service.

24         Q    Could you tell me just generally what your

25     job duties are?  What does a customer service

1    supervisor do?

2      A    Mail processing, distribution, supervise

3    the clerks, mail handlers.

4      Q    How big an office is Norwalk; what level?

5      A    Level 22, I believe.

6      Q    How many supervisors are there in Norwalk

7    besides you?

8      A    Gee, maybe 13.  Maybe.  We have a lot of

9    ASPs coming in and out, so I don't know the exact

10   number.

11     Q    There's a station manager, I assume, or is

12   it a postmaster in Norwalk?

13     A    We have a postmaster and a station manager.

14     Q    How many employees are you directly

15   responsible for supervising on average?

16     A    On average, 30, 35.

17     Q    I assume as a supervisor you are

18   responsible for their administrative issues such

19   as leave, discipline, attendance, things of that

20   nature?

21     A    Yes.

22     Q    And I would gather from what you said you

23   are responsible for making sure that the operation

24   to the extent you are supervising, it runs

25   efficiently?

```
1      A    Correct.

2      Q    Before you went to Norwalk, where were you

3    stationed?

4      A    In Stamford.

5      Q    In Stamford.  What was your level?

6      A    Sixteen.

7      Q    That's an EAS-16 supervisor?

8      A    Right.

9      Q    Was it a customer service supervisor

10   position, also?

11     A    Yes, but there I did delivery and

12   distribution.  It was a smaller station.

13     Q    How long had you been in Stamford?

14     A    I was in Stamford, I guess, from -- when

15   did I go to Stamford.  I was Stamford for maybe

16   four or five years maybe.

17     Q    Let me just do it this way:  Let's start

18   with the beginning of your employment history with

19   the Postal Service.  When did you first come into

20   the Postal Service?

21     A    1980.

22     Q    What did you come in as, craftperson or

23   EAS?

24     A    Craft.

25     Q    What craft were you in, ma'am?
```

1      A      Mail processing, clerk craft.

2      Q      At some point, you became a supervisor,

3    obviously?

4      A      Yes.

5      Q      When did that happen?

6      A      1992.

7      Q      What was the process that led you to

8    becoming a supervisor?

9      A      The process?

10      Q      Sure.  Did you apply for a supervisor

11    program?  Did you apply for a particular job?  How

12    is it you went from a craft employee to a

13    supervisor?

14      A      Management training program.

15      Q      Would that be something like what you just

16    described, the ASP program currently?

17      A      Similar, yeah.

18      Q      Were you nominated for that program, or did

19    you apply for it?

20      A      Applied for it.

21      Q      Did any manager provide a recommendation or

22    a nomination after you applied?

23      A      Yes.

24      Q      Who was that?

25      A      I know one was Don Cuccirillo (ph).  He was

1    from Mount Vernon.  Back then there were MSCs, and

2    Stamford was not part of Connecticut.  We were

3    part of MSCs for Mount Vernon.  Let's see, who

4    else?  I think I got another recommendation from

5    maybe Bob Olson.  I'm not sure.

6        Q    Where was Mr. Olson located?

7        A    In Stamford.

8        Q    Just tell me generally what the program

9    consisted of.  How long did it take?  What kind of

10   instruction did you get?

11       A    We were trained in every, I guess,

12   functional area, and we would spend anywhere

13   from -- well, it was only supposed to be a

14   two-year program and when I went into the program,

15   it happened to be at the wrong time because there

16   was a restructuring, and jobs were not to be had

17   because they were changing job positions and

18   titles.  So I stayed in the program close to three

19   years, I guess and went out on OIC assignments,

20   worked closely with different managers.  It was a

21   training program just so that you would be able to

22   go into just about any particular area

23   functionally.

24       Q    What was your first assignment after

25   graduating from the program as a supervisor?

1      A    My first assignment?

2      Q    Your first domicile, your first -- where

3    were you located?

4      A    When I finished the program, I was assigned

5    to Stamford.

6      Q    You stayed there, I gather, then until you

7    went to Norwalk?

8      A    Yes.

9      Q    Why the move from Stamford to Norwalk?

10    What caused you to move from one office to the

11    other?

12    A    Stamford was consolidating their offices,

13    their stations, and jobs were going to be -- they

14    weren't going to be able to place all the

15    supervisors, so a position came up in Norwalk

16    about the same time, so I applied for that one.

17    Q    Now, the claims in this lawsuit, as I

18    understand them, Ms. Butler, are that you were

19    discriminated on the -- against on the basis of

20    your age, your gender, your race and your color,

21    is that correct?

22    A    Yes.

23    Q    Are there any other claims being made in

24    this lawsuit other than those?

25    A    I don't believe so.

1    Q    To the best of your recollection, those are

2    the claims?

3    A    Yes.

4    Q    Now, my general understanding of the

5    factual surroundings here is that the claims

6    revolve around an unacceptable merit rating you

7    had gotten from James Long in fiscal year '96 and

8    the impact that had both on your EVA bonus that

9    year and thereafter, is that again correct?

10    A    Yes.

11    Q    In 1996, you were working in Stamford,

12    correct?

13    A    Correct.

14    Q    As a supervisor?

15    A    Correct.

16    Q    And who was the --

17    A    1996.

18    Q    Well, let me back up.  Let me strike that.

19        1995; let's start with the beginning of

20    1995.

21    A    September or -- in January?

22    Q    In January, are you working in Stamford at

23    that point?

24    A    Yes, I was stationed in Stamford.

25    Q    As a supervisor?

1    A    Yes.

2    Q    Who was the postmaster in Stamford at the

3    time in the beginning of '95?

4    A    They changed postmasters so often.  I

5    believe it was Bob Piva at that time.

6    Q    And as a supervisor, did you report

7    directly to Mr. Piva, or was there a station

8    manager between --

9    A    Station manager.

10    Q    Who was the station manager you reported

11    to?

12    A    Ralph Morrell.

13    Q    What station particularly did you work in

14    within the Stamford post office?

15    A    Ridgeway station.

16    Q    What are the other -- what were the other

17    stations within Stamford back in the beginning of

18    '95?

19    A    Glenbrook, Atlantic Street and Barry

20    Place.  And is there Sunnyside then?  Springdale.

21    Springdale.

22    Q    As of the beginning of '95, was that your

23    first year as a supervisor -- working as a

24    supervisor?

25    A    In '95?

1    Q    Yes.

2    A    I don't remember when I was exactly placed

3    there.  It may have been '94, the end of '94.  I'm

4    not sure exactly.

5    Q    Before the merit evaluation that's the

6    focus of this case, had you had other merit

7    evaluations as a supervisor prior to that one?

8    A    Yes.

9    Q    Do you remember how many?

10    A    It would be three.

11    Q    So, that would have been probably '95, '94,

12    '93?

13    A    Yeah, I think that's it.  Well, actually, I

14    think -- I don't know.  Something happened that

15    year.  I'm trying to remember because I got two

16    merits at the same time, within a week of each

17    other.  Both were unacceptable at that time.  I

18    don't know what happened, whether there was a

19    delay because of the EVA or how they were going to

20    evaluate what program they were going to go on.  I

21    don't know what happened at that time because '95

22    was -- it had to be when I came back in '96.  It

23    was '95 and the beginning of '96 together, I

24    believe.  I'm not sure exactly what years it was,

25    but it was two back to back, like, within days of

Falzarano Court Reporters

1    each other.

2        Q    Let me come back to that then.  You said

3    Ralph Morrell was the station manager?

4        A    Yes.

5        Q    What was the station again?  I'm sorry.

6        A    Ridgeway station.

7        Q    How many other supervisors were working in

8    Ridgeway station for Mr. Morrell back at the

9    beginning of '95?

10        A    Let me think.  I think there was, like, two

11    and might have been a 204-B replacement supervisor

12    there, also.

13        Q    Putting aside the 204-B for a minute, do

14    you remember who the other two regular or

15    full-time supervisors were besides you?

16        A    Oh, God.  There was Ken Fleming and Dan,

17    what's his last name, Luther (ph)?  I don't know.

18    He transferred to Arizona anyway, so I don't know

19    his name.

20        Q    Where it's warmer.

21        A    Then there were other supervisors that were

22    working with me, also that were regular

23    supervisors, but they came from other stations,

24    also.

25        Q    Who would those folks have been?

1    A    Mike Parent.  Bob Palmer worked there for a

2    while.  I think those are the only two that came.

3    Q    Mr. Parent and Mr. Palmer, they were within

4    the Stamford post office but from different

5    stations, is that correct?

6    A    Yes.

7    Q    Just so I get this straight, they were

8    working physically in Ridgeway even though they

9    were technically assigned to some other station

10   within Stamford, is that right?

11   A    Uh-huh.

12   Q    What kind of duties -- strike that.  Were

13   they doing the same kind of supervisory duties you

14   were?

15   A    Yes.

16   Q    Do you know why it was that they happened

17   to be over there as opposed to whatever station

18   they were technically assigned to?

19   A    They were moving people around.  I don't

20   know.  I think at the time Bob Piva left, and I

21   think Jim Long came in for a while.  George Fisher

22   came.  They were shuffling managers, postmasters

23   back and forth there at that time.  I don't know.

24   Just rotating them around.

25   Q    You just mentioned Jim Long who's one of

1   the officials mentioned in this case.  Was

2   Mr. Long in there as an OIC; an officer in charge?

3       A    Yeah, I believe so.

4       Q    I gather then from what you just said

5   someone named George Fisher took over after

6   Mr. Long left?

7       A    I'm trying to even think now because,

8   actually, it was Bob Piva when I was placed there,

9   and then it went -- he left and there was, like, a

10  couple OICs that were there before Jim Long came.

11      Q    It's my understanding that in July or

12  thereabouts of 1995, you were involved in an auto

13  accident, is that right?

14      A    Correct.

15      Q    It's also my understanding that as a result

16  of the accident you were out of work for some

17  point up until some point after that accident, is

18  that right?

19      A    Correct.

20      Q    How long were you out of work in total, if

21  you can recall?

22      A    I think I was out of work for -- until May

23  of '96.

24      Q    So, July of '95 through?

25      A    April.  I'm not sure of the exact month I

1    came back.

2        Q    It was sometime after the beginning of

3    1996, as far as you can recall?

4        A    Uh-huh.

5        Q    When you came back, did you go back into

6    your same supervisor - customer service position

7    that you had occupied the last day before the

8    accident?

9        A    Yes.

10       Q    During the time you were out, were you on

11   sick leave?

12       A    Yes.

13       Q    Because my understanding -- strike that.

14            Was the accident a work-related accident,

15   or was it on your own time?

16       A    On my own time.

17       Q    Did you have enough sick leave to cover

18   that whole period of your absence?

19       A    No, not the whole period.

20       Q    When you first came back in 1996, whatever

21   month it was -- and let me just try and narrow it

22   down a little bit -- was it still the winter of

23   '96 do you think when you came back?  Was it

24   cold?

25       A    It might have been April or May.  I'm not

Falzarano Court Reporters

1    sure of the exact month.

2        Q    When you came back from that, did your

3    hours change at all or your duties or anything

4    about your job as a supervisor from the period

5    before the accident?

6        A    I don't know if they changed then right

7    away, but my hours did change.

8        Q    Eventually, they changed?

9        A    Yes.

10       Q    Was your rate of pay the same?  I'm sorry

11   if I asked you that before.  What was your

12   supervisor's rate?

13       A    Yeah, it was -- I was a 16.

14       Q    You are a level 17 now, is that correct?

15       A    Yes.

16       Q    Is that a result of a promotion, or how did

17   you get from 16 to 17?

18       A    They upgraded the positions.

19       Q    All supervisors became level 17?

20       A    Level 17.

21       Q    With respect to the merit evaluation that's

22   at issue in this case, my understanding is that

23   occurred in fiscal year 1996, is that right?

24       A    The actual --

25       Q    The actual evaluation.

1    A    It was in '96.

2    Q    Tell me who did that evaluation.

3    A    Ralph Morrell.

4    Q    Where did it take place?  Was it in person

5    in the office?

6    A    Yes.

7    Q    Do you remember approximately what month it

8    occurred in?

9    A    Maybe it was September.

10   Q    September of '96?

11   A    I think.

12   Q    Had Mr. Morrell done prior EAS merit

13   reviews with you, or was this the first one with

14   him?

15   A    No.  I think he had done one before.  I'm

16   not sure.  I'm not really sure.  Geez, it was so

17   long ago.

18   Q    In the conversation with Mr. Morrell, what

19   was said by him with respect to your merit rating

20   for that year?

21   A    He said it was satisfactory and said he

22   was -- everyone was getting satisfactory and just

23   sign it and send it back down to Jim Long.  He had

24   to do it and send it back in.

25   Q    It was your understanding then that

1    Mr. Morrell would conduct this merit interview

2    with you, for lack of a better term, and then he

3    would send whatever documentation was completed

4    down to Mr. Long?

5        A    Uh-huh.

6        Q    Because at this time Mr. Long was the OIC,

7    is that correct?

8        A    Yes.

9        Q    Other than saying it was -- well, my

10   understanding is, again, there are several grades

11   on the merit rating; far exceeds, exceeds, meets

12   and unacceptable, is that correct?

13       A    Right.

14       Q    What had Mr. Morrell recommended or checked

15   in the box, do you remember?

16       A    Acceptable, met expectations.  I think

17   that's how they were reading then.  I think they

18   have since changed it.

19       Q    Was there any other conversation with

20   Mr. Morrell, other than what you told me, that you

21   can recall?

22       A    At that time?  No.

23       Q    When is the next time you heard from

24   anybody in management about that merit rating?

25       A    I don't know.  I don't know whether it was

Falzarano Court Reporters

```
1    a few days later he came back and told me, he said

2    that he had to change the merit rating to

3    unacceptable.

4        Q    This is Mr. Morrell who told you that?

5        A    Yes.

6        Q    Did he say why he was changing it, or were

7    those his words, he had to change it?

8        A    Yes.

9        Q    Did he explain why he had to change it?

10       A    He said that he was told by Jim Long to

11   change it.

12       Q    Did he say anything else about it other

13   than that?

14       A    Not that I recall other than that.

15       Q    What was your response, if any, Ms. Butler,

16   to that news?  What did you say to him?

17       A    I told him, I said, That's very unfair and

18   I says, Is that what you want to do?  He said, No,

19   but I have to do what my boss tells me to do.

20       Q    Did he offer any explanation of why

21   Mr. Long had told him to do this?

22       A    He said he got it from the district office.

23       Q    That "he" being Mr. Long got it from the

24   district office?

25       A    Yes.
```

1    Q    When he said the "district office," did he

2    identify anybody particular at the district

3    office, or was it just the district office?

4    A    No, he did.  He said it was Jerry Newlan.

5    Q    And Mr. Newlan was, I guess, the district

6    HR manager, is that correct?

7    A    Yes.

8    Q    You explained to Mr. Morrell you thought

9    this was unfair.  You described your conversation

10   with him.

11        Was there any more conversation between you

12   and Mr. Morrell on that occasion?

13   A    No.

14   Q    Did you after that have any conversation

15   with Mr. Long about this issue?

16   A    Yes.

17   Q    When did that take place, and what was the

18   conversation?

19   A    I believe he was coming to give me another

20   merit.

21   Q    A second merit evaluation?

22   A    For another year.

23   Q    Would this have been because you missed one

24   year?

25   A    No.  I think it was that they just were

1    behind.  I don't know what happened that year -- I

2    mean those two years.  I don't know what was going

3    on, whether -- no, because I normally -- when I

4    was in the management training program, I would

5    get my evaluation from the manager of training.

6    That's where my evaluations would come from for

7    the merit.

8         I really -- I can't even recall why I was

9    getting two back to back.  It wasn't because I was

10   out, or maybe it might have been because I had the

11   accident in July and didn't get the one -- or --

12   anyway, there were two within days of each other.

13   Q    This second one then, the discussion with

14   Mr. Long, where did that take place?

15   A    In Ridgeway, came up to Ridgeway station.

16   I believe he came there.

17   Q    What did he say to you?

18   A    Let me think.  It was so strange.  I think

19   we were talking about the first one that I got,

20   and he said he changed it, and he said he was --

21   he told me, he said that was -- he said he was

22   told that that was a preliminary evaluation.  I

23   said, No.  That was the paper you signed off for

24   your merit, nothing on there said preliminary.

25   Preliminary evaluation.  And he says, Well, that's

1    what it was.

2           And he said at that time he was telling me,

3    he said, You are going to get another one, I have

4    another one for you, and that's going to be

5    unacceptable, also.

6      Q    Did he give you a second evaluation?

7      A    I don't know if it was that day, but I did

8    get another one, yeah.

9      Q    Do you still have copies of the two

10    evaluation forms?

11     A    No, I don't.  I think I sent the copies

12    with my file when I sent in everything -- I sent

13    the copies of the evaluations.  I sent my -- when

14    we have to write out our -- we write out our

15    goals, and then we write out our accomplishments,

16    and I sent everything up, copies of everything

17    up.

18           I turned in -- for my merit evaluation, you

19    have to submit everything, and then they

20    evaluate -- give you an evaluation.

21     Q    If I could show you a document,

22    Ms. Butler, that's contained in the report of

23    investigation file in this case, the agency's EEO

24    file, it's marked as page 13, and I'll make a copy

25    and make it an exhibit here.  Could you tell me if

1    you recognize that?

2        A    Uh-huh.

3              MR. BARBER:  You have to answer

4          yes or no.

5        A    Yes.  Yes, I do.

6    BY MR. RICE:

7        Q    Is that the first or the second or a

8    different evaluation form?

9        A    This is different than the first one I

10   signed with Ralph Morrell.

11       Q    Is this the second one that you were

12   testifying about?

13       A    I don't know.  I don't know by the dates.

14       Q    I would suggest --

15       A    There were two.  I know there were two, and

16   I don't know.  Both of them, he told me they were

17   going to be unacceptable, and the one I signed

18   with Ralph Morrell was met expectations.  And then

19   he told me it was going to be changed, that it had

20   to be unacceptable.

21       Q    And if I could show you on the bottom

22   left-hand corner, is that a copy of your

23   signature?

24       A    Yes.

25       Q    It's dated December 3rd of 1996?

1    A    Uh-huh.

2    Q    Would that have been the day that you met

3    with Mr. Long in Ridgeway, the date you were just

4    talking about?

5    A    Maybe.  Maybe.  I'm not sure.  I'm confused

6    with the times because I'm looking at the dates.

7    Q    Let me ask you this and maybe it will

8    clarify it this way:  Was there more than one

9    discussion between you and Mr. Long relevant to

10    your evaluations?

11    A    I think twice.  I think twice.  I'm not

12    sure.  I'm not sure.

13

14         (Defendant's Exhibit 1:

15             Marked for identification.)

16

17    BY MR. RICE:

18    Q    Ms. Butler, after -- strike that.

19         During the discussion with Mr. Long about

20    your merit evaluation, which I guess I suggest to

21    you this copy has been marked Exhibit 1 in this

22    deposition, did he tell you why it was being --

23    you were being marked as unacceptable?

24    A    He said that -- I don't know if I recall

25    his exact words.  Maybe the gist of what he was

1    saying was I haven't been at work enough time.

2        Q    What did you understand that to mean?

3        A    I don't know.  And I told him, I said, What

4    do you mean?  Because I asked him, I said, What do

5    you mean?  He says, Well, you've been out of work

6    so we can't judge your performance.

7        Q    When he was referring to you being out of

8    work, is this the time that you were out after the

9    auto accident?

10       A    Yes.

11       Q    What, if any, response did you make to that

12   statement by Mr. Long?

13       A    I told him, I said that I don't think

14   that's fair.  I said that I should have been

15   offered FMLA, Family Medical Leave Act was in

16   effect, and that's not to be held against you when

17   you are in that status.  I said, I was never

18   offered that.

19            Also, I was released to come to work -- go

20   back to work in -- I went down to Stamford the day

21   before Thanksgiving in 1995, and I had a note from

22   the doctor to return to work.  They said I needed

23   to go to their doctor for an evaluation.  I didn't

24   get an appointment until January.  That's when

25   they sent me a notice to -- for an appointment.

1      Q    Did you get an appointment or an exam in

2   January of '96?

3      A    Yes.

4      Q    Does that kind of refresh your recollection

5   about how long after that appointment you went

6   back to work?

7      A    The doctor that they sent me to said that I

8   was not supposed to drive more than 15 miles, and

9   I told him my doctor released me to work.  He

10  says, No, and so they got the information in

11  Stamford.  And I said, Can you place me somewhere

12  else that's closer than a 15-mile radius, and

13  nothing happened.

14        Let me see.  I don't know who was the OIC

15  at that time.  It was a woman.  A woman was there

16  in November when I went to return to work, and I

17  don't know who was the OIC once I got the note

18  from the doctor that I couldn't drive more than 15

19  miles.

20        And then -- what was the next thing that

21  happened.  I asked them if they could find a

22  placement for me anywhere closer to my house

23  within a 15-mile radius, and I had no response.  I

24  even came to New Haven and I spoke to Sheldon

25  Rhineart.  He said he would have to get something

1    from the postmaster -- my postmaster in Stamford

2    to place me here because they had 204-Bs here.

3    They had replacement supervisors.  Nothing

4    happened.

5            The next thing I know, I got a letter to go

6    to disability retirement counseling.  I told them

7    I wasn't disabled, and I wanted to work.  I just

8    needed to be closer just for a while.  I think the

9    doctor put it down for another either two months,

10   maybe a little more.  That was the evaluation.

11           I went to the doctor that was on Chapel

12   Street, Occupational Health or something like

13   that.  I'm not sure exactly the name of the

14   facility.  But it's on Chapel and Sherman.

15   Q    After that evaluation, did you go back to

16   work?  Is that when you went back to work?

17   A    I think I went back to the doctor -- to

18   that doctor again, and then he released me to come

19   back.  It was okay for me to go back to work.

20   Q    That's when you went back to the Stamford

21   post office, to Ridgeway station?

22   A    Yes.

23   Q    When you told Mr. Long these things, what

24   was his response, if any?

25   A    He says, Well, this is what it is.  He just

1    said, This is what your evaluation is.  This is

2    your merit.

3        Q    Did he offer you any reason other than it's

4    an attendance issue?

5        A    Nothing else.

6        Q    Did he indicate whether he had talked to

7    Jerry Newlan or anybody else in district personnel

8    about this matter?

9        A    Yeah.  He did tell me at that time also

10   that he had spoke with Jerry Newlan, and he had

11   told him to change it, that that's what it was

12   going to be, unacceptable.  I said, Why would he

13   be involved in my merit, you know?  That, I

14   couldn't understand either.

15       Q    Had you ever up to that point met

16   Mr. Newlan?

17       A    Yes.

18       Q    In what context had you met Mr. Newlan?

19       A    The manager in training program fell under

20   human resources because it came under training

21   which is human resources.  I worked in Hartford at

22   the district office for a while.

23       Q    Did you work in Mr. Newlan's office or in

24   HR generally?

25       A    I worked in the EEO.  I worked in -- I

1    worked in EEO.  I worked in human resources, yeah,

2    I did.  I didn't work directly in his office but

3    --

4        Q    In the human resource function?

5        A    Functions, yes.

6        Q    Had you had any negative interaction with

7    Mr. Newlan up to that point?

8        A    Not really -- I mean, no.  Just that, you

9    know, I guess it was the -- at that particular

10   time, I guess the program was dragging on because

11   there was no placement for people because of their

12   restructuring, and it was just, I guess at that

13   time no one really wanted to deal with the

14   management trainees, okay?  We were shuffled

15   around.

16       Q    Did Mr. Long say anything else about

17   whatever conversation he had with Mr. Newlan

18   relative to your merit evaluation?

19       A    No.

20       Q    Was that the end of the conversation with

21   Mr. Long on that topic that day?

22       A    Pretty much.

23       Q    Did you ever have a later conversation with

24   Mr. Long about this issue?

25       A    I don't remember.  I'm not sure.

1     Q   After hearing from Mr. Long that your merit

2    rating was going to be unacceptable, did you take

3    any steps on putting aside the EEO issue and the

4    lawsuit issue?  Did you take any steps to call

5    Mr. Newlan, talk to anybody else, anything at all?

6     A   No.

7     Q   Other than talking to Mr. Newlan, did

8    Mr. Long indicate that he received any input or

9    information relative to your situation from

10   anybody else?

11    A   Not that I know of.

12    Q   Now, with respect to your age -- and

13   pardon me if I ask -- how old were you at the

14   time?  This is in '96 I'm referring to.

15    A   Ninety-six.  I was born in '55.  How old

16   was I?

17    Q   Maybe 41?

18    A   Something like that, 41, 42.

19    Q   It's your contention in this lawsuit that

20   your age was a reason or one of the reasons this

21   decision was made with respect to your merit

22   evaluation, is that right?

23    A   Yes.

24    Q   What is it, what facts do you base that on,

25   Ms. Butler?

1    A    I just looked at the other people that were

2    in the office that received their evaluations, and

3    they were satisfactory.

4    Q    Were those people younger than you?

5    A    Yes.

6    Q    When you are talking about other people,

7    which other people are we talking about?

8    A    Other supervisors.

9    Q    Specifically what other supervisors?

10    A    I don't remember all of them -- all of

11    their names.  I remember they were younger than

12    me.

13    Q    If I name some people for you, maybe you

14    could tell me if these are the people you are

15    thinking of.  Gene Gaudio?

16    A    No.

17    Q    Justine McDermott?

18    A    No.

19    Q    William Hurley?

20    A    I don't know if he's younger than I am.

21    I'm not sure.

22    Q    Adele Ryan?

23    A    I don't know their ages, but I just know

24    there were people that were younger than me that

25    got satisfactory merits.

1      Q    I guess what I'm asking is, who are those

2    people?

3      A    I don't know if they were -- there were

4    other supervisors there, and I don't recall all

5    their names.

6      Q    Do you recall any of the names?

7      A    Originally they were in Stamford.  I don't

8    know whether they were officially in Stamford or

9    were they just there.

10      Q    Do you know if Mr. Long did their

11    evaluations?

12      A    Usually it's your station manager that does

13    your evaluations, and I don't know if he did their

14    evaluations -- I mean, I've never had an instance

15    where the postmaster does it.  Usually if you have

16    a station manager, the station manager does the

17    evaluation.

18      Q    Other than what you've just testified to,

19    is there anything else that you know of that

20    causes you to believe that this merit evaluation

21    from '96 was based on your age?

22      A    I don't know.  I really don't know, but I

23    just feel there were people that were younger than

24    me that received a fair evaluation.

25      Q    But as to those people, you are not sure --

1      A    And then I'm basing this also on the way I

2    was treated when the doctor -- when I didn't get

3    -- I couldn't return to work in January because

4    of the distance.  They had a 204-B.  When I came

5    back, there was a 204-B that was in there, and he

6    was younger and it was like they were grooming

7    this person to take the job.  It was before I even

8    got my evaluation.

9         I think that's my phone.

10

11         MR. RICE:  Let's take a break.

12

13         (Recess: 12:25 to 12:29 p.m.)

14

15    BY MR. RICE:

16      Q    Ms. Butler, just getting back to the age

17    discrimination claim, just so I understand, you

18    believe there were people younger than you that

19    received satisfactory merit evaluations the same

20    year that you received an unsatisfactory one, is

21    that correct?

22      A    Yes.

23      Q    Do you know what the attendance records of

24    those people may or may not have been?

25      A    No.

1      Q     Going to the claim that you were

2    discriminated against in this case on the basis of

3    your gender, why is it that you believe that your

4    unsatisfactory evaluation was related to your

5    gender?

6      A     Because I was a female.

7      Q     Other than the fact that you are a female,

8    what is it about your being female that causes you

9    to believe that this unsatisfactory evaluation was

10   based on that?

11     A     I was evaluated by two males, and both of

12   them were telling me that they were getting

13   directions from another male who was telling them

14   to change it and make it unacceptable.

15     Q     Is that the basis for your belief that your

16   gender is the reason for this?

17     A     Yes, and there are other men that work in

18   -- males in Stamford that received a

19   satisfactory.

20     Q     Who are they?

21     A     I don't know all their names.  I don't

22   think anyone got an unacceptable.

23     Q     How do you know anybody else received --

24   strike that.

25         The males you are thinking of, do you

1    know -- who are you thinking of specifically?

2    What males?

3        A    Let me see.  I know my station manager.

4        Q    That would be Mr. Morrell?

5        A    Yes.  Jim Long because they show -- at that

6    time, there was a listing of the monetary -- money

7    they were getting, too.

8        Q    Mr. Morrell got a satisfactory as far as

9    you know?

10       A    Uh-huh.

11       Q    Mr. Long?

12       A    Yes.

13       Q    Was Mr. Long's -- how do you know about

14   Mr. Morrell's; did he tell you, or was it posted

15   somewhere?

16       A    People talk.  Supervisors get together, and

17   everyone says who got what, and it was common

18   knowledge that mine was unacceptable.

19       Q    Did Mr. Morrell tell you he got an

20   acceptable?

21       A    Yes.

22       Q    Did Mr. Long tell you he got an acceptable?

23       A    No, he didn't tell me that.

24       Q    How do you know about Mr. Long's then?

25       A    One of the other supervisors talking.

1    Q    What supervisor was that?

2    A    I don't know.  Just supervisors talk, and

3    there's always talk, and people inquire as to who

4    got what, and the most talk is who didn't get a

5    merit.

6    Q    We've got Mr. Morrell, Mr. Long.  Who else

7    are you thinking of that was a male that got an

8    acceptable one and you didn't?

9    A    Maybe -- I think everyone else got

10   acceptable, Mike Parent, Dave Duddie.  I don't

11   know all the supervisors there.  Mark Dolan.

12   Q    Do you know --

13   A    Was Ken Fleming there then?

14   Q    Was Mr. Fleming evaluated by Mr. Long

15   during the same time period as your evaluation?

16   A    I don't know because he was in the station

17   with me.  Normally the station manager does it,

18   and I didn't understand why I was doing it with

19   the OIC who was the postmaster.

20   Q    With respect to the people that you've just

21   described, do you know what their attendance

22   records were during this same period?

23   A    No, I don't know.

24   Q    Other than what you've just told me,

25   Ms. Butler, is there anything else that causes you

1    to believe your gender was a factor in this

2    unacceptable merit evaluation that's at issue

3    here?

4        A    Not that I can think of right now.

5        Q    You've also alleged that your race was a

6    factor in your receiving this unacceptable merit

7    rating.  What is it that makes you think that,

8    what facts?

9        A    I don't know.  I'm Black-American.  I was

10    evaluated by a white male --

11        Q    Is there --

12        A    -- and there were no -- I don't know if

13    there were any other black supervisors there at

14    that time.  I don't even know if they were -- were

15    there 204-Bs permanently there in Stamford?  I'm

16    not sure.

17        Q    Are there any other factors that makes you

18    think your race was considered in giving you this

19    unacceptable evaluation?

20        A    Maybe some prejudice there.  I felt that,

21    prejudice.  I did.

22        Q    Was this prejudice by Mr. Long against you?

23        A    Yeah.

24        Q    What is it that Mr. Long did or said that

25    caused you to believe that he was prejudiced to

1    you on the basis of your race?

2        A    Sometimes you can't put it into words.

3    It's just sometimes people's actions.

4        Q    What did he do?

5        A    Some things they make you feel, not very

6    objective, very subjective, like, you know, just

7    -- I had seen him before when I was working in

8    Stamford before, just kind of looked down on you

9    type of, not talk to you, really could come into

10   the station and speak to everyone -- speak to the

11   other supervisors, not me.  Just, you can see it.

12   It's something that sometimes you can't say that

13   they actually did it, it's directed toward you,

14   but not in a way that maybe -- I just know that if

15   you come into a station and there are supervisors

16   there and you speak to every other supervisor and

17   you just ignore the other one there, that happened

18   quite a few times.  Just never really addressed me

19   as speaking to me.  It was there.

20       Q    When was the -- how many times did Mr. --

21   what you are saying, to make sure I get it right,

22   Mr. Long would not talk to you when he showed up

23   at the station, is that right?

24       A    Wasn't so much that he wouldn't talk to

25   me.  It was, like, ignore or, like, you are not

1    there.  Have a conversation with the other

2    supervisors, they were all males, they were all

3    white males there, never really include me.

4      Q    Do you know what his conversations with the

5    other supervisors were?

6      A    Sometimes it was about work.  Sometimes it

7    was about golf.  Sometimes it was about games,

8    baseball, whatever.  It necessarily was not work,

9    but sometimes that it was, I wasn't included.

10     Q    Did Mr. Long ever make -- did he ever say

11   anything in terms of, did he use a racial epithet

12   or anything like that toward you?

13     A    No.

14     Q    Did he ever swear at you?

15     A    Not that I recall.

16     Q    Did he ever shout at you?

17     A    When we had that meeting, he was a little

18   adamant at what -- he was trying to get the point

19   across that I wasn't going to be changed, and

20   that's what it was.

21     Q    Was he shouting during that meeting?

22     A    He was raising his voice.

23     Q    Were you raising your voice?

24     A    Actually, by that time I was resigned that

25   I was -- that I just was not going to really deal

1    with this.  Once they came back and told me it was

2    a preliminary evaluation and I said, Oh, I've

3    never even heard of that; you don't have it on the

4    form; you are just coming up with anything; you

5    are just telling me anything and I'm supposed to

6    buy it, so, hey, I just do what I have to do.

7        Q    What other things has Mr. Long done that

8    makes you think he's prejudiced against you based

9    on your race?

10        A    Well, I guess -- I don't know.  You might

11   not be able to really -- it's really hard to

12   explain but you know when someone is not talking

13   to you.  You know when someone doesn't really want

14   to address you.  They don't really want to accept

15   you as being there as -- in your capacity or, you

16   know, it's totally ignored.

17        Q    You think Mr. Long disliked you?

18        A    I really don't know.  I really don't know.

19   I really didn't think it was a job situation.  It

20   was a work environment situation, and I didn't

21   think it was supposed to be subjective like that,

22   but I kept getting that same feeling that you

23   really don't even want to acknowledge me here.

24        Q    Can you verbalize any more than you have

25   what it is he did that caused you to have this

1   feeling?

2      A    It's just, you know.  I'm black, I know

3   someone doesn't want to address me, that doesn't

4   want to accept me in my position, that doesn't

5   want to really -- if they have something, they may

6   say something to another supervisor that's on the

7   same level as I am, but they won't come and talk

8   to me about it.  It's like they don't want to

9   relate to me.  It's not -- in no way other than --

10   that I can see other than, you know, it's got to

11   be race -- racial.

12      Q    So, just so I understand, what you've told

13   me, is that the sum total of why you think Mr.

14   Long was prejudiced against you with respect to --

15   in connection with your race with respect to this

16   unacceptable merit evaluation?  Is there anything

17   else?

18      A    It's hard for me to explain it to you.

19      Q    Well --

20      A    It's very hard to explain.  It's something

21   that, you know it and most people don't want to

22   recognize it.  I don't know.  I just can't explain

23   it to you.

24      Q    Other than what you have explained to me,

25   there is nothing else you can explain to me about

1    that?

2        A    I don't know how to explain it to you any

3    better than that other than I know when someone is

4    ignoring me, and it's not based on anything I've

5    said or done.

6        Q    With respect to your color, is there --

7    other than the testimony you've given me with

8    respect to your race, is there something different

9    about your color as opposed to your race that

10    causes you to believe Mr. Long was discriminating

11    against you?

12        A    My color?

13        Q    Yes.  They are two separate claims.

14        A    I know.  I guess maybe if I wasn't -- it

15    would make a difference -- I mean, I don't know.

16    It's just, I know when I'm sure.  If you were --

17    it might show if you put yourself in my shoes, you

18    would know when someone is not basing their

19    conversation or approaching you or feeling that

20    you can, based on your performance, based on your

21    aptitude, based on your abilities, your

22    capabilities, they are just looking at your color,

23    looking at your race.  They don't see anything

24    other than that.

25        Q    Other than what you've already testified

1    to, is there anything else about your color or

2    race or -- strike that.

3          Is there anything Mr. Long did or said, and

4    putting aside what you've already told me, I

5    understand that, is there anything else about

6    Mr. Long's conduct that causes you to believe that

7    your race and/or color was part of his decision to

8    give you the unacceptable merit evaluation?

9    A    Not that I recall right now.

10   Q    Where was Mr. Long physically located?

11   Where was his office as OIC when he was the OIC in

12   Stamford?

13   A    Atlantic Street, I believe.

14   Q    Where is Atlantic Street relative to

15   Ridgeway?

16   A    Up by -- six miles away.

17   Q    Atlantic Street is one of those substations

18   within the Stamford post office that you described

19   earlier?

20   A    Yes.

21   Q    As a supervisor, Ms. Butler, in your time

22   as a supervisor, have you had occasion to

23   discipline employees for attendance-related

24   issues?

25   A    Yes.

1    Q    What would be the range of discipline that

2    you've meted out relative to attendance issues?

3    A    I've given official discussions, go over

4    their 3972s, may have given a letter of warning.

5    Q    Any suspensions?

6    A    I don't believe I've done any suspensions.

7    Q    Have you known other supervisors to suspend

8    people relative to attendance issues?

9    A    Yes.

10    Q    Would it be fair to say that the Postal

11    Service as an agency considers regular attendance

12    to be a fairly important issue?

13    A    Correct.

14    Q    Would it be fair to say in your experience

15    that it's an important issue because if people

16    aren't regular in attendance, if they are not

17    there, the work they are supposed to be doing

18    doesn't get done or has to be done by somebody

19    else?

20    A    Correct.  But, by the same token, if

21    someone has a catastrophic illness or they are

22    unable to come to work, that's why we offer FMLA,

23    and anyone that falls under that category if it's

24    under their status as Family Medical Leave Act, we

25    do not hold -- if they are not able to come to

1    work and it falls under that status, it's not held

2    against them or their attendance.

3        Q    In your case, were you on FMLA leave during

4    this period?

5        A    No, I wasn't offered that.  That's what I

6    told him when they did this.  I said, you know, I

7    should have been given FMLA.

8        Q    Did you ask for FMLA leave?

9        A    No.  That's not how it works.  They are

10   supposed to send you a letter home, and it was

11   never sent.

12       Q    Were you familiar with the Family Medical

13   Leave Act before your accident?

14       A    Was I familiar with it?  Yes, I was

15   familiar with it.  I told them at the time.  Ralph

16   said, Don't worry about it.  And then they would

17   send something out.  Nothing ever came out, so I

18   said, you know, they know I'm out and I have a car

19   accident.  I didn't expect them to do that at all,

20   and I said, You know, you should have given me the

21   FMLA papers to fill out.  It's their

22   responsibility, and if someone is out more than a

23   certain period of time under the way the program

24   is administered, they are to send out the papers.

25       Q    But other than the conversation you just

1    talked about, you didn't pursue FMLA status?

2       A    No, because I would just call in and tell

3    them what hours to put in and everything was fine.

4       Q    Did you pursue it retroactively after you

5    went back?  Did you say, Look, my status ought to

6    be converted?

7       A    No.

8       Q    Any particular reason why you didn't?

9       A    No.  I asked him, I said, If you are going

10   to hold the attendance against me that I wasn't

11   here at the work, I said, You should put it under

12   FMLA.  It should have been under FMLA.  He said,

13   This is what you are getting.

14      Q    Did you pursue the FMLA issue any further?

15      A    No.

16      Q    Ms. Butler, if I could show you a copy of a

17   set of interrogatory answers which are your

18   interrogatory answers in this case and your

19   response to request for production of documents.

20   Have you seen this before?

21      A    Yes.

22      Q    Are these your answers in fact?

23      A    Yes.

24      Q    I note they are not signed by you.

25             MR. RICE:  Can we stipulate,

1           Jerry, that these are her answers, and

2           she would have signed them under the

3           pains and penalties of perjury?

4               MR. BARBER:  Yes, we will

5           stipulate to that and have her do a

6           signature page.

7               MR. RICE:   Thank you.

8     BY MR. RICE:

9        Q    Looking at number 1, Ms. Butler, you've

10    listed four people as people who have either

11    discriminated or retaliated against you.  Gerald

12    Newlan I believe you've testified to.  Other than

13    what you've testified to today about Mr. Newlan,

14    is there any other act of discrimination or

15    retaliation that Mr. Newlan has engaged in that's

16    claimed in this case?

17       A    Not that I recall right now.

18       Q    Same question with respect to Mr. Long.

19    You've testified at some length about Mr. Long

20    today.  Is there anything other than what you've

21    told me today that would --

22       A    Not that I recall.

23       Q    Mr. Morrell, you've talked about

24    Mr. Morrell and his conversations with you today.

25    Is there something, other than those conversations

1    you've already testified to that Mr. Morrell did,

2    that amounts to a discriminatory or retaliatory

3    act?

4        A    I don't recall.

5        Q    The last person you've named is somebody

6    named Debbie Essler.  Who is Ms. Essler?

7        A    She was the OIC in Stamford when I was

8    released to return to work by my doctor.

9        Q    Would she have been the OIC before

10   Mr. Long?

11       A    I don't know.  She was -- there may have

12   been someone in between before he was there.  I

13   don't know.

14       Q    Somewhere in November of 1995, Miss Essler

15   was the OIC in Stamford, is that right?

16       A    Uh-huh.

17       Q    Looking at question 2, I take it from

18   question 2 with respect to Miss Essler, it's your

19   contention she didn't set up a fitness for duty

20   examination in a timely fashion, that issue.

21           You not coming back until later in '96, is

22   that right?

23       A    Correct.

24       Q    Is there anything else Miss Essler did

25   other than that?

1    A    Not that I recall, no.

2    Q    With respect to the unacceptable merit

3    evaluation you received, did that have an effect

4    on EVA?

5    A    Of course.

6    Q    Would you tell us just for the sake of the

7    record, what was EVA?

8    A    I don't remember.

9    Q    It's been a while.

10    A    It's been a while.  All I know is that your

11    merit gives you your own raise you get as a

12    supervisor, and each year you get a merit

13    evaluation so if you miss two years in a row, you

14    get no raise for two years, so you are thrown off

15    all the subsequent years.  Your salary has changed

16    from that year forward.

17    Q    What, if you know, would have been the

18    difference between your salary with met objective

19    as opposed to unacceptable?

20    A    Unacceptable, you get 0.

21    Q    What would you have gotten if you got the

22    next category of met objectives and expectations?

23    A    I'm not sure, 3 percent or whatever it is.

24    I'm not sure.  It's a percentage.

25    Q    In addition to not getting the salary

1    increase and the effect you have been talking

2    about, what other financial damage have you

3    suffered as a result of the unacceptable merit

4    evaluation?

5    A    Financially I'm at a lower rate of pay.  I

6    have less available cash -- I mean, I have a

7    family, also, that I have to take care of.  I have

8    a son that's in college -- that's in school -- I

9    mean, it's affected me in that I have not -- I

10   should be at a higher rate of pay now than I am

11   now -- than I am.

12   Q    I don't mean to laugh; I'm sorry.  It's

13   just the way you expressed it.

14        What's your current rate of pay?

15   A    I think we just got a merit in the last pay

16   period.  I think it's 52,000.

17   Q    Where is it that you think you would have

18   been had you received an acceptable or a met

19   objectives and expectations back in fiscal year

20   '96?

21   A    We are talking about almost 10 years of

22   pay.  Probably close to 62.

23   Q    You think there's probably a $10,000

24   difference between where you are now and where you

25   would have been, is that correct?

Falzarano Court Reporters

1    A    Yes.

2    Q    Do you know what comparable supervisors

3    make, level 17s, with your time and grade working

4    in Norwalk make now?

5    A    I don't know.  I really don't know.

6    Q    Any other financial damages, other than

7    what you've just testified to, are claimed in this

8    case?

9    A    Yeah.  Financially, this damage, it may

10   mean that I -- once you get unacceptable, it's

11   very hard, you get stigmatized, so it's harder to

12   apply for other jobs or other positions without

13   them looking at your record, and they want to know

14   if this is unacceptable.  Look what it says, here

15   this is what it's saying:  Individual's

16   performance relative to the basic expectations of

17   the job was unsatisfactory, including poor quality

18   results, failure to meet commitments.

19        If you are telling me this was based on an

20   attendance issue, no one is going to look back in

21   the records.  All they are going to look at is

22   what your merit was, why you were unacceptable.

23   Q    Have you applied for jobs, other positions

24   in the Postal Service since getting that merit

25   rating in '96?

1     A     Yeah, I think I did.

2     Q     What positions did you apply for?

3     A     Let me see.  I think I applied for one in

4     human resources.

5     Q     What position was it?

6     A     Oh, God, I can't even remember.  I know it

7     wasn't a supervisory position.

8     Q     Do you remember when it was you applied?

9     A     It was administrative.  I applied for a few

10    positions, maybe about four positions since then.

11    Q     Something in human resources, maybe an

12    analyst position?

13    A     I don't know.  I'm not sure.  I'm not

14    sure.  I know I applied for other positions, and

15    -- I don't know.  I felt that I was qualified for

16    the position.

17    Q     Can you tell me, besides the HR position,

18    what were the other positions that you applied

19    for?

20    A     I applied for an account representative

21    position.  I think I applied for a labor position,

22    also.  I think an EEO position.

23    Q     And all four of those jobs would have been

24    in the Connecticut district offices?

25    A     Yeah, I believe so.

1      Q    Do you know why you didn't get those

2    positions?

3      A    No.

4      Q    Did anybody ever tell you whether your

5    merit evaluation from '96 had any impact on that?

6      A    I think it's an unstated given that people

7    talk, and most of the positions that I wanted were

8    under human resources, would fall under the

9    functional area of human resources, most of the

10   positions I wanted that I was interested in.  I

11   don't know.  People talk.

12     Q    I guess my question was:  Did anybody say

13   to you you are not getting this job because of

14   your merit review back in fiscal year '96?

15     A    I don't think anyone would ever come out

16   and say that.

17     Q    Whether they would or not, did they ever?

18     A    No, not that I recall.

19     Q    In addition to the financial damages you've

20   talked about, there's a claim for compensatory

21   damages in this case.  Have you received any

22   third-party counseling, psychiatric treatment

23   relative to damages claimed in this case?

24     A    No, I have not.

25     Q    And there is, I assume, an attorney's fees

1    claim which I'm sure Mr. Barber can give me a

2    rundown on if I need.  Are there any other damages

3    I haven't touched on or that you haven't told me

4    about?

5        A    You are stigmatized.  At that time, it was

6    very painful, it was hurtful, because I didn't see

7    any justification, and I think it was done just

8    to -- that's the only way a supervisor is able to

9    get any raise.  It's the only way you get a

10   raise.  It's the only evaluation that you get.

11   It's just very simply, those three lines there,

12   and it's a career issue right there.

13       Q    With respect to your interrogatory answers,

14   ma'am, in answer Number 3, you refer to two

15   people, Dave, question mark, Bobby, question

16   mark.  Do you know the last names of those folks?

17       A    Dave Duddie and Bobby Palmer.

18       Q    Did Mr. Long do their evaluations also, do

19   you know?

20       A    They were supervisors there when he was

21   there.

22       Q    But my question is:  Do you know if he did

23   their evaluations in '96?

24       A    I don't know.  I really don't know if he

25   did them -- I mean, I've never known the

1  postmaster to do them when you have a station

2  manager.  They were other stations.  I don't know

3  if he did them or not.

4  Q    Their absence -- you said they were absent

5  due to illness.  Would they have been absent in

6  the same period that you were absent, '95 to '96?

7  A    I don't know.  I know they have been out,

8  they have had illness.

9  Q    Have they been out for the same extended

10  period that you were out, do you know?

11  A    I don't know how long it was.  I'm not

12  sure.

13  Q    Mr. Duddie and Mr. Palmer, do they work at

14  Ridgeway?

15  A    Ridgeway.  It's Ridgeway.  They may have

16  worked there during the course of their career.

17  Did they work there with me?  Bob Palmer worked

18  there with me for a while.  Dave Duddie?  No.  He

19  might have been there for a couple weeks.  I don't

20  know.  They were shuffling back and forth.

21  Q    Floating around?

22  A    Floating around.

23  Q    Other than what you've told me, you don't

24  have any information about what kind of absence

25  record they had?

Falzarano Court Reporters

1      A    No.

2      Q    Give me a couple seconds.

3

4           (Pause.)

5

6      Q    Other than what you've told me already this

7    morning, Ms. Butler, is there any other facts that

8    you know of that you rely on in claiming that your

9    age, gender, race or color was the basis for this

10   unacceptable merit evaluation in '96?

11     A    Not that I recall, no.  I can't think of

12   anything right now.

13           MR. RICE:  I'm all finished.

14           MR. BARBER:  I'll take the unusual

15       step of asking you some questions.

16

17                  CROSS-EXAMINATION

18

19   BY MR. BARBER:

20     Q    Just going back to Exhibit 1, your EAS

21   merit performance evaluation, can you look at

22   category 4, not rated?  It says, "Experience with

23   the individual's performance was insufficient to

24   determine an appropriate performance category or

25   other relevant contingency."  Do you see that?

1      A    Yes.

2      Q    Did Mr. Long ever say to you that, Well,

3   you haven't been here.  Your absence makes it

4   impossible for me to evaluate your work?

5      A    Never.

6      Q    Rather than check that category he gave

7   you, the unacceptable, and you just testified

8   previously that that unacceptable rating does

9   carry a stigmatism or a stigma attached to

10  it --

11     A    Correct.

12     Q    -- it talks about your basic expectations,

13  you are not doing it.  That's saying your

14  performance -- wouldn't you say your

15  performance --

16     A    Right.

17     Q    -- was substandard?

18     A    Correct.

19     Q    He's saying -- that was your understanding?

20     A    Yes.

21     Q    Somehow they are saying you performed

22  unsatisfactory during the time when you weren't

23  even there?

24     A    Right.

25     Q    I don't have --

1      A    When I asked him, I said, If you are giving

2    me a rating on my performance, I said, You can't

3    hold it against me if I'm not there.  But he said,

4    This is what you are getting.  And there was no --

5    I even threw out -- gave him the option of saying,

6    Okay, you are right, you should have been under

7    the FMLA status.  It should not have been held

8    against you that you were out.

9            No.  No, he never mentioned to put not

10   rated on there, and I had not worked for him, and

11   he was not there during the time of that

12   evaluation.

13     Q    He signed it as your evaluator, is that

14   correct?

15     A    Right.

16     Q    He was not your evaluator?

17     A    No.

18            MR. BARBER:  Nothing further.

19

20                REDIRECT EXAMINATION

21

22   BY MR. RICE:

23     Q    Do you believe that Mr. Long is being

24   untruthful if he says I didn't think your

25   attendance was good enough and, therefore, you got

1    an unacceptable?  Do you think that's a lie?

2       A    Is that a lie?

3       Q    Yes.  Even if you disagreed with him, do

4    you think he's lying when he says that?

5            MR. BARBER:  Objection.

6       A    I wouldn't know what he was thinking.

7    BY MR. RICE:

8       Q    Is being at work a basic expectation of the

9    job of a supervisor?

10      A    Yes, I come to work.

11           MR. RICE:  I have nothing else.

12           MR. BARBER:  That's all I have.

13        Miss Butler, thank you very much.

14           (Deposition concluded: 1:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1       STATE OF CONNECTICUT

2       I, LEE ANN BIANCUCCI, LSR #224, RPR, a Notary

3    Public duly commissioned and qualified in and for

4    the State of Connecticut, do hereby certify that

5    pursuant to Notice, there came before me on the

6    22nd day of January, 2004, the following-named

7    person, to wit: TANYA BUTLER, who was by me duly

8    sworn to testify to the truth and nothing but the

9    truth; that she was thereupon carefully examined

10   upon her oath and her examination reduced to

11   writing under my supervision; that this deposition

12   is a true record of the testimony given by the

13   witness.

14      I further certify that I am neither attorney nor

15   counsel for nor related to nor employed by any of

16   the parties to the action in which this deposition

17   is taken, and further that I am not a relative or

18   employee of any attorney or counsel employed by

19   the parties hereto, or financially interested in

20   this action.

21      IN WITNESS THEREOF, I have hereunto set my hand

22   and affixed my seal this    day of        2004.

23   _____

24   Lee Ann Biancucci, LSR 224, RPR

25

Falzarano Court Reporters

1                          INDEX

WITNESS                                    PAGE

2

TANYA BUTLER

3

      Direct Examination by Mr. Rice        4

4

      Cross-Examination by Mr. Barber      58

5

      Redirect Examination by Mr. Rice     60

6

7                  DEFENDANT'S EXHIBIT
                   (For Identification)

8

EXHIBIT                                    PAGE

9

    1   EAS Merit Performance Evaluation,
10      Tanya Butler, 11/25/96; 1 page      26

11

(Reporter's Note: Exhibit enclosed with original
12  transcript.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   LAB                          JURAT

2

3   --------------------------x
    TANYA BUTLER,                  :
4          Plaintiff,              :    CIVIL ACTION NO.
                                   :    3:02CV1896 (SRU)
           vs.                     :
5                                  :
    JOHN E. POTTER,                :    January 22, 2004
6   Postmaster General,           :
    U.S. Postal Service,          :
7          Defendant.             :
    --------------------------x

8

9     With the addition of the changes, if any,
    indicated on the attached errata sheet, the
10  foregoing is a true and accurate transcript of my
    testimony given in the above-entitled action on
11  January 22, 2004.

12  _____

13      TANYA BUTLER

14

15    Subscribed and sworn to before me, the
    undersigned authority, on this the _____ day of
16  _____, 2004.

17  _____
          Notary Public

18

19  My Commission Expires:

20

21

22

23

24

25

Falzarano Court Reporters

```
 1    LAB                ERRATA SHEET

 2    Please note any corrections on this sheet.  DO NOT
      mark up the transcript.
 3
      The ORIGINAL JURAT and ERRATA SHEETS must be
 4    NOTARIZED (even if there are no corrections) and
      returned within 30 days of receipt to the attorney
 5    who took the DIRECT EXAMINATION.  All other
      counsel of record must be sent a COPY, along with
 6    a COPY to our office for our records.

 7

 8    Page   Line   From              To
            _____
 9
            _____
10
            _____
11
            _____
12
            _____
13
            _____
14
            _____
15
            _____
16
            _____
17
            _____
18
            _____
19
            _____
20
21    _____       TANYA BUTLER
      Date
22
      Sworn to before me this _____day of
23    _____, 2004.

24    _____
              Notary Public
25    My Commission Expires:
```

Falzarano Court Reporters



# EAS Merit Performance Evaluation

| Employee Name | | Social Security Number | | |
|---|---|---|---|---|
| **Butler, T I** | | **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** | | |
| Title | | Occupation Code | EAS Grade | Finance Number |
| **Supv Customer Services** | | | **16** | **08-7718** |
| Organization | Period | | Time in Current Assignment | |
| **Stamford Post Office** | From: **9/16/95**  To: **9/13/96** | | | |

I. **Overall Evaluation of Individual Accomplishments/Results:** Evaluate the personal accomplishments/results of the employee. Consider the objectives set at the beginning of the evaluation period (Section IV) as well as the Narrative of Work Accomplishments supplied by the employee.

| | Categories | Definitions |
|---|---|---|
| ☐ | **Far Exceeded Objectives/ Expectations (FE)** | Overall contribution to the business, both functionally and organizationally, exceeded expectations of the job. Individual consistently produced very good to excellent results. |
| ☐ | **Met Objectives/ Expectations (M)** | Overall contribution to the business, both functionally and organizationally, met and sometimes exceeded the expectations of the job. Individual consistently produced proficient results. |
| ☒ | **Unacceptable (U)** | Individual's performance relative to the basic expectations of the job was unsatisfactory, including poor quality results and failure to meet commitments. |
| ☐ | **Not Rated (NR)** | Experience with the individual's performance was insufficient to determine an appropriate performance category or other relevant contingency (attach explanation). |

II. **Recommendation/Approval required:**

| Approved by: | Title/Position | Date |
|---|---|---|
| Second Level Approval*:  Jo Saunders | Title/Position | Date  11-25-96 |

\* Second level approval required for ratings of Far Exceeds (FE) or Unacceptable (U).

III. **Final Evaluation Discussed with Employee**

| Employee's Signature and Date*  BnlN  12/3/96 | Evaluator's Signature and Date  James Long |
|---|---|

\* Employee's signature acknowledges discussion of final evaluation and receipt of a copy. It does not necessarily imply agreement.



EX 3

17